We will hear argument this morning in case number 19-123, Fulton v. City of Philadelphia. Ms. Windham. Mr. Chief Justice, and may it please the Court, the courts below made a simple error. They failed to understand where Employment Division v. Smith controls and where it doesn't. Smith doesn't control when the government uses a system of individualized exemptions, or when it makes other exceptions that undermine its rules, or when it changes the rules to prohibit a religious practice. Philadelphia made all three of those errors here. The city still can't identify a neutral, generally applicable law, even after six attempts, and it now acknowledges its decisions are subjective and individualized. Yet the courts below still applied Smith. They even said Smith would be a dead letter if petitioners prevailed. That demonstrates the confusion and instability Smith has caused. Respondents, rather than defend Smith, ask the court for a newly minted constitutional standard that's even less protective of religious exercise. That approach has no basis in the text, history, or traditions of the free exercise clause. The city has no compelling reason for excluding Catholic social services, which has exercised its faith by serving at-risk children in Philadelphia for two centuries. Nor does it have any interest in refusing to allow the agency to step aside and provide referrals elsewhere. Yet Philadelphia is refusing to place children with loving mothers, like Sharon L. Fulton and Toni Sims Bush, just because they chose to partner with an agency who shares their faith. Respondents act as if this is a zero-sum game. Either LGBTQ couples can foster, or Fulton and CSS can, but the law and decades of experience say otherwise. The free exercise clause is at the heart of our pluralistic society, and it protects petitioners' vital work for the Philadelphia community. I welcome the court's questions. Ms. Wyndham, this is a case involving free exercise rights, but it's in their intention with another set of rights, those recognized in our decision in Obergefell, and whatever you think that tension should be resolved as a matter of government regulation, shouldn't the city get to strike the balance as it wishes when it comes to setting conditions for participating in what is, after all, its foster program? Mr. Chief Justice, I don't believe that that analysis should control here for a couple of different reasons. This court's precedents make clear that when the government is acting as sovereign, using its regulatory authority, like when it's applying a city-wide fair practices ordinance, or the ordinances in Lukumi, then the court does the normal free exercise clause analysis. The same thing is true when the city is deciding at the outset who's able to participate in a program. You don't see any difference in terms of the analysis, whether it's simply a regulation, the city issuing a rule that governs across the board, as opposed to part of the rules for participating in a program. In other words, not in its sovereign capacity, but in a managerial capacity, or a business capacity. The city isn't acting in one of those capacities here, and I think a key fact here is the fact that they are relying on the fair practices ordinance. The fact that they put that into a contract— Mr. Chief Justice, if you had a situation which is unlike Lukumi, unlike licensing, unlike Trinity Lutheran or Espinoza, when the government is managing internal affairs, then the government's interests may be stronger. But here, Philadelphia has said that CSS is an independent contractor and is not an employee or agent of the city. Thank you, counsel. Justice Thomas? Thank you, Mr. Chief Justice. Counsel, following up on the Chief Justice's question, this seems to involve both contractual relationships with the city, as well as, as the Chief said, regulatory or licensing. In that instance, when you have both aspects of that, do we analyze it as a government contract—again, referring back to the Chief's point—or as a sort of a licensure program where the city has basically taken over an area and now it has certain requirements of the regulated industry? Justice Thomas, as your Honor acknowledged there at the end, the city is trying to regulate an area that has historically been an area of religious practice. I think that that sets this case apart from many cases the city is citing. It's correct they're using regulatory authority. They're using sovereign authority. They're using licensing authority to decide who gets to participate. Those are cases where this Court's precedents have said you do the normal constitutional analysis. There's not some special rule. Here, where both the old contracts and the new contracts say that we're not an employee or agent of the city, the same analysis should apply here as did Lukumi and Espinoza and Trinity Lutheran. This is different from a case like Bowen where you're trying to reach out as a third party and tell the city how to run its internal affairs. Here, the city is reaching out and telling a private religious ministry, which has been doing this work for two centuries, how to run its internal affairs and trying to coerce it to make statements that are contrary to its religious beliefs as a condition of continuing to participate the religious exercise that they have carried out in Philadelphia for two centuries. Thank you. Justice Breyer? Yes, thank you. On pages 45 and 46 of the city's brief, they say that they aren't requiring you to endorse same-sex marriages. They say all they're asking you to do is evaluate a couple without reference to whether they are same-sex or not. You've read that. It says your objection is to being required to evaluate and provide written endorsements of a same-sex relationship, but they aren't saying to do that. Indeed, they say add something onto any response you make and say that you do not endorse same-sex marriages. Say it. You see what it says. So suppose pages 45 and 46 were written right into your contract, allowing you to say whatever you want about same-sex. All they want you to do is evaluate this couple irrespective of same or different sex. What is your religious objection to that? So, Justice Breyer, I'm going to point your honor to the joint appendix at 210 to 211 and then 237, where that very question was asked. And the head of Catholic Social Services testified that certifying a home of a same-sex couple would be in violation of that religious belief, that a home study is essentially a validation of the relationships in the home, and that a final home study includes a written endorsement of the relevant relationships of the foster parent. And the state law as well asks an agency to assess the ability of applicants for approval as foster parents. What the city is asking CSS to do here is to certify, validate, and make statements that it cannot make. And I'm not aware of any case where this court has said it's okay to compel speech or coerce religious exercise as long as you can tag a disclaimer onto the end of it. Respondents certainly haven't cited any. It would be hurtful for CSS and for the couple, if any couple ever approached them, for them to go into their home, assess their relationships, interview them about their intimate relationships and their family, and then at the end of that have to say, we cannot provide that approval for you and your family. CSS is making a modest request here, which is to step aside and be able to allow diverse religious agencies to serve the city of Philadelphia as they have done successfully for many years. Well, you don't have to say, according to them, whether the couple is married, whether it's not married, whether it's same sex, whether it's a different sex. You just put that to the side, make a note that you're putting it to the side, and say other than that, they're okay or they're not okay. That's all you have to do. Now, what's the problem? I still don't quite see it. You said in your response that you don't want to do it, which I understand that you don't, but they say they're imposing a requirement that does not interfere with your, they can't figure out how does it interfere, and so we write 45 and 46 right into your contract, word for word, and now tell me once again, what's the problem? In your last answer, you just said they can't make you say anything. I guess that's true, but we write 45 and 46 and say you can say something if you want or you don't have to if you don't want to, but just take same sex, different sex, and put it to the side and say other than that, are they qualified? What they're still being asked to do is to evaluate, assess, and approve of a couple under state law and in their own written report. That's something that they have testified that they cannot do. This is also not an unknown or unusual religious belief. 11 states have passed laws to specifically protect religious child welfare providers in this context. As the USCCB brief points out, there have been agency closures across the country, over this very issue. What we're asking here- Justice Alito? Let me ask you a couple of questions about what's in the record of this case, about the facts of the case. To begin, as far as the record reflects, how many same sex couples in Philadelphia have been denied the opportunity to be foster parents as a result of Catholic social services policy? Zero. In fact, Justice Alito, none had even approached Catholic social services asking for this approval and endorsement. Before the events at issue now, how many children had been placed, were in homes that had been evaluated by Catholic social services? At the time of the referral freeze, there were well over 100 children who are currently being served. And over the years, there have been thousands who've been served by Catholic social services. How many children are awaiting placement in foster homes in Philadelphia? According to the city of Philadelphia, at the time when they froze intake for CSS, there were 250 children who were in group homes who needed to be moved out of those homes and into family homes. This is in the best interest of the children. It's actually an obligation under state law. But Commissioner Figueroa, at page 352 to 53 of the JA, acknowledged that those children were still in group homes and that those children were not going to be moved into homes. They're supported by Catholic social services. One of your main arguments concerns the fact that there are exemptions to the generally applicable rules under the city's policy. I'm somewhat uncertain about what the city's final position is about the availability of exemptions. What is your understanding of that? Justice Alito, I understand that there are individualized exemptions from provision 3.21 of the contract and also through the Waiver Exemption Committee, that there are categorical exemptions. Whenever an agency conducts a home study, they have to consider disability, marital status, and familial status. That's prohibited by the city's Fair Practices Ordinance. The city itself actually deviates from the Fair Practices Ordinance, even though it is bound by it, when it is making placement decisions in foster care. Do they make the exemptions at the initial stage or only at the placement stage? Justice Alito, the city's exemptions are at the placement stage, but for the agencies, those exemptions are happening when they're carrying out the home studies. The exact same point in the process that the city is trying to coerce Catholic social services here. Of course, the Waiver and Exemption Committee could, in theory, give them at any stage. Thank you. Justice Sotomayor? Counsel, I'm interested in why you see yourself as a licensee as opposed to a government contractor. I understand that many governments throughout the country do these home assessments and certifications internally. They hire employees within the government, they set up criteria, and they're the ones who choose to certify a family or not. So why aren't you any different than a government contractor? What license are you receiving? I've never heard of a license where they pay you to take the license. Justice Sotomayor, the city is exercising a licensing authority because it is deciding which foster agencies are able to perform these services in the city of Philadelphia. That's no different than deciding, setting forth criteria to hire someone to do work for you. It's a lovely argument, but I'm having a very hard time accepting how when the city sets forth a set of criteria, only these people can do this work for me. That's not a license. That's an employment contract. It's an employment contract. And the city has been crystal clear that CSS is not its employee or agent. Philadelphia, Pennsylvania has chosen to partner with private agencies to do this work. But state, I mean, we have often permitted and we have a legion of cases with people who are not state actors or agents or actual employees, but contractors or people who are being retained to do things for the government where we said the government can set the criteria it wants. Why aren't you any different? What the city is trying to do here is tell religious groups who have been doing this prior to when the city got involved, we're going to exclude you. You can no longer carry out this work unless you take actions that are contrary to your faith. That is something that the free exercise clause prohibits. That's what Philadelphia is attempting to do here. Philadelphia's and the respondent's position here is the dangerous one because we're saying, they're saying that even if you're not the employee or agent. Counsel, I'm sorry, counsel. I don't have much time, but just one last point. What is dangerous is the idea that a contractor with a religious belief could come in and say, exclude other religions from being families, certifying families, exclude someone with a disability. How do we avoid that or exclude interracial couples? Justice Sotomayor, the city actually allows agencies to exclude people with disabilities today. That's one of the exceptions that they have from their contract. Well, that's not exclusion. They require an agency to be specialized in that placement. If the agency gets the specialization, it could become one. The agency actually can exclude parents on the basis of disability from providing foster care. But what does that have to do with certifying a family? Meaning, those are two different functions. The certification process is who's eligible, and they don't require someone to be married even, same sex or not. That's different than placing a child, which is governed by the best interest of the child. Briefly, counsel? Justice Sotomayor, the state law at 55 Pennsylvania Code 3700.64 does take into account disability including mental and emotional stability. Thank you, counsel. Justice Kagan? Good morning, Ms. Winsom. I'd like to take you back to the Chief Justice's opening questions and give you a hypothetical. Suppose that there's a state and it doesn't want to operate its prisons itself. It contracts with private organizations to do so. In the contract, there's a provision that says that no employee can use drugs of any kind. A group that wants to operate a prison says it wants an exemption for peyote use. What would be the result in that case? Well, Justice Kagan, I think to know the result in that case, first of all, we would have to know whether the government's rules there are neutral and generally applicable. I believe the free exercise analysis would apply. Well, I guess the question that I'm trying to get at is, here's the government in its capacity as a contractor saying something, a condition that's extremely relevant to the state, and shouldn't the government have leeway to do that, to just say, you know, it doesn't matter why you want to use peyote, whether it's religious or anything else. We're just going to say there should be no peyote use and no other drug use. Justice Kagan, I think that the state would be likely to prevail in that case for a couple of reasons. One is that, unlike here, the government's interests are going to be a lot stronger. The government there is actually taking something that's traditionally a public function and handing it out to private organizations, as opposed to here, taking, moving in and increasingly regulating and restricting work that has traditionally been private. Well, there are a lot of things that governments do now, if you would excuse me, Ms. Windham, just to put another question on the table. I mean, there are a lot of things that governments do now that traditionally were done by private organizations, religious organizations. I mean, you could go through, you know, youth homes or homeless shelters. A lot of old philanthropy is now regulated and conducted by the government. Why should that matter? Justice Kagan, because I think that really points up the question in this case, does the free exercise clause shrink every time the government expands its reach and begins to regulate work that has historically and traditionally been done by religious groups? Would you have a different argument if a religious group that had never engaged in this kind of activity said, now we want to? Would that make a difference to you? Justice Kagan, I think it would make a difference. I think the history here is important. I think that when you're looking at the government's interest in that case, that would be relevant, too. Here, the city calls CSS a point of light in its foster care system, and it has worked successfully for the children of Philadelphia with no detriment to the LGBTQ population of Philadelphia. And so I think that the- Justice Gorsuch? Good morning, counsel. What do we do with the fact that the city seems to be representing to us here and now that the Fair Practices Ordinance is binding of its own force and that the department can't offer any exemptions? Justice Gorsuch, I think that that's a very important fact here, because if we're stepping out of the contracting context now, and we are firmly in the regulating context, what the city is saying to Catholic Social Services is that it is illegal for you to do this work in the city of Philadelphia, according to your religious exercise, whether you contract with the government or not. And how does Philadelphia, in its written documents with the Catholic Social Services, treat it? Is it an employee, an agent? The city is quite clear at JA-634 and SA-17 that CSS is an independent contractor and shall not be deemed or intended to be an employee or agent of the city. And how long has Catholic Services been engaged in this activity? They've been doing it for two centuries now. And what do we do with your de facto exemption argument, given the fact that we have a finding by the district court that there are none? The district court's error there is an error of law. The district court said that it was a generally applicable law as long as it didn't prescribe particular conduct only or primarily when religiously motivated. You can see that Petition Appendix 87. And so the district court there had the wrong idea about what counts as an exception, what counts to make something not generally applicable, and it made an error of law there. If we thought that were a finding of fact and we were stuck with it, then what would you argue? I would argue in that case, if the court did think it was a finding of fact, that under the court's decisions in Hurley and Bowes in a First Amendment case, the court is going to make an independent review of the record. And that's particularly pertinent here where we're talking about the words of a contract, the words of a city law, the words of a state regulation. This is the workaday business of the courts to interpret and apply the law. And with respect to Section... Oh, I see my time's expired. Thank you. Thank you, counsel. Justice Kavanaugh? Thank you, Mr. Chief Justice, and good morning, Ms. Windham. I want to follow up on some of Justice Alito's questions and just make sure I have some of the facts down pat here. First, as I understand it, Philadelphia contracts with about 30 private foster agencies to find and train and support foster families, and Catholic Social Services is just one of them, as I understand it. And second, if a same-sex couple ever came to Catholic Social Services, Catholic Social Services would refer that couple to another agency that works with same-sex couples so that the couple could participate and be foster parents. And then third, no same-sex couple has ever come to Catholic Social Services for participation in this program, and therefore, a Catholic Social Services policy has never actually denied any same-sex couple the opportunity to be foster parents in Philadelphia. So I want to make sure those three facts are accurate and you can elaborate as you see fit. That's all correct, Justice Kavanaugh, and that demonstrates first that CSS is not going to prevent any same-sex couple from being able to foster in Philadelphia. There are many other agencies out there. They're merely asking to be able to step aside and recuse if that situation were ever to arise. It also demonstrates the city doesn't have a compelling interest here. This is a system that has worked effectively and worked well for many years. This is an unnecessary conflict. The city of Philadelphia had an easy option here, which is to allow Catholic Social Services to continue the great work that it's been doing. Unfortunately, because the courts below decided to apply Employment Division v. Smith, the city thinks that it's under no obligation to consider, respect, and accommodate religious exercise, which demonstrates how far off the rails our free exercise jurisprudence has gone in this case. Thank you. Justice Barrett? Good morning, Ms. Linden. So you just kind of indicated that, you know, that maybe Smith shouldn't have been applied here, and you argue in your brief that Smith should be overruled. But you also say that you win even under Smith because this policy is neither generally applicable nor neutral. So if you're right about that, why should we even entertain the question whether to overrule Smith? Justice Barrett, you're exactly right that we can and should win this case even under Smith. The question then to the court will be how it resolves the legal question and what guidance it provides to the courts below. This court in cases like Trinity, Lutheran, and Espinoza looks to the text, history, and traditions of the free exercise clause, and those make clear that Smith is a bad fit. Smith has caused negative results, developments since Smith was decided make clear that its prediction has actually not borne out, that it is possible for the government to accommodate and partner with religious organizations to do religious exercise. What would you replace Smith with? Do you just want to return to Sherbert v. Werner? I believe that the court's free exercise jurisprudence gives us some guidance there. In cases like the ministerial exception or church autonomy, the court doesn't even look at the Smith-Lukumi line of cases. In cases like Lukumi and Trinity-Lutheran, the court has looked at the non-neutrality or targeting. But in other cases, I think the question should be pretty simple. Is the free exercise of religion being prohibited? And if so, does the government have a compelling reason for doing so? Here, the government does not. Last question. If we did overrule Smith, or frankly, even if we didn't, let's take this out of the same-sex marriage context and put it into interracial marriage context. So Justice Sotomayor was indicating an example like this. What if there was an agency who believed that interracial marriage was an offense against God and therefore objected to certifying interracial couples as foster families? Would they be entitled to an exemption? And if so, how is that distinguishable from, or if not, how is that distinguishable from CSS's refusal to certify children to couples in same-sex marriages? No, Your Honor. If that case were even to get to strict scrutiny, this court has been clear in Loving and other cases that government has a compelling interest in eradicating racial discrimination. It's a far cry from here where Commissioner Ali said that the interest is no stronger or no weaker than enforcing any other policy. It's hard to imagine the city making that kind of concession in a case involving interracial marriage. Thank you. Ms. Windham, you have a minute to wrap up. Philadelphia will make exceptions to its rules for lots of reasons, but not for the reason of CSS's religious exercise. Regardless of the legal mechanism that Philadelphia uses, the bottom line is that CSS is breaking the city's law if it even refers same-sex couples to another agency better suited to help them. And as a result, Philadelphia won't place children with Sharon L. Fulton, Tony Sims or CSS unless their church changes or violates its beliefs. In our pluralistic society, a properly functioning free exercise clause is supposed to prevent this kind of unnecessary and harmful conflict. There are children in need and loving homes waiting for them. Neither Philadelphia nor Smith should stand in the way. Thank you. Thank you, Counsel. Mr. Luthan? Mr. Chief Justice, it may please the court. Philadelphia has not afforded Catholic social services the tolerance of religious practice that is required by the free exercise clause and vital to our pluralistic nation. The city refuses to place foster children in available foster homes certified by CSS simply because if CSS were ever asked to certify a gay couple, it would respectfully decline and refer them to another foster agency. The city's draconian response to CSS's hypothetical position discriminates against religious exercise for two reasons. First, the city lacks a generally applicable role because it seeks to apply a non-discrimination requirement to CSS despite having exempted comparable secular conduct, thereby devaluing CSS's religious concerns. Second, the city has not mutually applied its role because it has shown undue disrespect to CSS's sincere religious beliefs by treating a win-win accommodation as too odious to tolerate. Counsel, you rely, as does the petitioner, on Contract Provision 3.21, which bans a list of objectionable practices, but then has, at the end, unless an exception is granted by the commissioner in his or her sole discretion. Has an exception ever been granted under that provision? I'm not sure that there's any evidence of that one way or the other, Your Honor, but I think the key exceptions that have been granted and have been recognized in the record is that the city both requires, tolerates, and itself engages in the consideration of protected traits when certifying and placing foster children. In particular, under 55 Pennsylvania Code 3764, the city requires agencies to consider both familial status and disability in certifying foster parents. The city has tolerated racial and ethnic-based outreach for foster parents, and then the city itself considers race and disability when placing children. The federal government, of course, has an extensive contracting regime, and it draws distinctions, I think, on the basis of, for example, disability, minority ownership, and all that. How does the contract rules have to be neutral and generally applicable across the board, even with respect to protected status? Well, Your Honor, the federal government, of course, is subject to RFRA, but so for the purposes of a state government, if a state chooses to recognize exceptions to its anti-discrimination provisions within its contractual setting, it can no longer claim to be acting in a generally applicable and neutral way. Thank you, counsel. Justice Thomas? I have no questions, Mr. Chief Justice. Justice Breyer? Yes. Did you call? Sorry, the machine didn't work. Can you hear me? Yes. Yes, Your Honor. Very well. I'd like to follow up on two questions that have been asked, the questions of the interracial marriage. Everything is the same, except it's interracial. The response so far from your side has been, well, that's a compelling interest. This isn't. Think of other examples. The government wants to contract to a food distributor to supply food on all the military basis, and because they're Orthodox Jews, they want nothing to do with ham and don't want to let anybody else, they want nothing to do with it. Or consider a religion which says, we're bidding on this contract for local transportation, and we want men and women to sit separately, or we want women to wear headscarves. Now, in a contracting basis, is it your opinion that the government just has to do that, has to give in to the religious belief or not? Your Honor, I think the question under our submission is whether the government is acting in a generally applicable and neutral way. If the government has a blanket anti-discrimination provision, that would be one thing. But if, as in this case, the government is forced to have an anti-discrimination provision, but then itself recognizes myriad exceptions, it is generally going to have undermined its compelling interest, and it's going to have to explain why it can tolerate deviations from that anti-discrimination provision in a whole host of areas, but it cannot tolerate a deviation for a religious accommodation. We can get other people to supply the ham, they say, and so that's all right. But we can't do anything about this, the headscarves, and we can't do anything about the interracial marriage. So in your idea, how does that work out? Well, I would differentiate the interracial marriage from the rest of them, Your Honor. On interracial marriage, this Court has made clear repeatedly that there's a particularly compelling interest in eradicating racial discrimination. You want to start, Narek, and I want to interrupt you right here, because now two of you have said this, that we should write an opinion which says discrimination on the basis of race, constitutionally speaking, is different than discrimination on the basis of gender, on the basis of religion, on the basis of nationality, on the basis of homosexuality. All right? Is that the opinion you want us to write? Briefly, counsel? Your Honor, I think this Court in Pena-Rodriguez already said something very similar about how race is unique in this country's constitutional history, and eradicating that type of racial discrimination presents a particularly unique and compelling interest. Justice Alito? Didn't the Court in Obergefell say exactly that? Didn't the Court say that there are honorable and respectable reasons for continuing to oppose same-sex marriage? Would the Court say the same thing about interracial marriage? Sorry, Your Honor. Obergefell does say that. Loving, of course, didn't say that and never would have said that. In addition, also recognized similarly that there are contexts and circumstances in which gay couples can recognize and accept that there are longstanding, deep-seated, sincere religious beliefs that oppose same-sex marriage, and in a pluralistic nation that respects religious tolerance, accommodating those sort of religious practices does not undermine the compelling interest in the same—sorry—tolerating that religious practice is consistent with the Free Exercise Clause in a way that, if you're dealing with interracial marriage, it would not give any significant compelling interest in that context. We don't reach constitutional questions as a general matter unless we have to. That's a strong policy. But what do the arguments in this case about—the complicated arguments about exemptions and the new arguments about contracting, the question whether Catholic Social Services is more like a regular licensee or more like a contractor—say about the stability of the employment division versus Smith precedent? Well, Your Honor, the government, as you know, we haven't taken a position on Smith. We do think that this is a relatively straightforward case under Smith, that the city has not acted in a generally applicable and neutral way. We think that the record makes clear that the city has recognized married exceptions from its anti-discrimination provision and that the courts below erred just because they made a legal error in not treating those as exemptions because they looked too narrowly at whether—if an entity had engaged in the same practice for a non-religious reason, would the city have treated them differently? And that's just contrary to Lukumi. And Lukumi itself, if there had been a non-religious actor who had engaged in a ritual sacrifice of an animal, Hialeah's ordinances would have picked up those people, too. Thank you, counsel. Thank you. Justice Sotomayor? Counsel, I've always thought that a compelling state interest that motivated our holdings in racial discrimination cases was not merely that race was important, but that the burden on the people who are rejected because of race is an interest that the state could seek to protect, that a rejection on the basis of race or any protected category creates a stigma on that person, and that it's a compelling state interest for the state to have an anti-discrimination law on the basis of protected classes. Are you diminishing that as a compelling state interest? No, Your Honor. I think that consideration of that just cuts in the opposite direction here for two reasons. The first reason is no gay couple is being denied the ability to serve as a foster parent in this situation first. May I interrupt you there? They are by this agency. CSS is saying to them, I won't certify you. It is an independent contractor with the city, and the city has said to that couple, we won't discriminate against you, but CSS, our independent contractor, doesn't want to serve you, doesn't want to certify you, not on the basis of any of the criteria that the state has set forth. You might meet every criteria the state sets forth, but they're imposing an additional criteria. So, two points about that, Your Honor. The first is, as a factual matter, no gay couple has ever actually tried to use CSS, and I think that reflects the point— I suspect that part of that is just natural, meaning people gravitate to agencies that are known by their community. And so, I am sure, and this is one of the arguments that was resolved against the petitioner here, it's not that the agency has—that the city has agencies who cater only to one community. It's that some agencies live in a particular community, and so more people will come to it from that community. Well, Your Honor, I think, respectfully, I think it might more reflect the point that Justice Alito made earlier, that gay couples can recognize and accept that the Catholic Social Services and Catholic Church has a deep-seated, sincere, religious objection to gay marriage, and thus they don't seek out CSS to serve as their foster agency. But on the flip side, I think it's important to emphasize that the city's rules do consider disability when certifying foster parents. So, foster parents can be denied the ability to serve as foster parents because of their disability. So, again, the city is allowing that sort of dignitary harm that Your Honor pointed to, and they're saying that sometimes that dignitary harm isn't enough, but they're not willing to allow that to happen in this context, where it's a totally hypothetical harm, and where, by enforcing that hypothetical harm, they're actually harming the children they support to serve. Thank you, Counsel. Justice Kagan? Good morning, Mr. Mupad. If I understood you correctly, you said that it is a compelling state interest to eradicate racial discrimination, but it is not a compelling state interest to eradicate discrimination on the basis of sexual orientation. And I was wondering, where in this scale that you're using would discrimination on the basis of gender come? Would that be a compelling state interest? So, for example, if there's an agency that refuses to employ women, would the state have to contract with that agency? Well, Your Honor, just to be clear, my point was that the government in Philadelphia, in this case, has undermined its compelling interest, any compelling interest it might have, in eradicating sexual orientation discrimination, because it has recognized a slew of exceptions. And what I was suggesting is that, with respect to racial discrimination, given the significance— Is it a compelling state interest to want to eradicate discrimination against gays and lesbians? I'm sorry, Your Honor, I didn't hear the beginning of your question. Is it a compelling state interest to try to eradicate discrimination against gays and lesbians? Is that a compelling state interest? So, we're not denying the significance of that interest in the abstract. What we're saying is that— Is it a compelling state interest, Mr. Mupad? In the abstract, perhaps, but on the facts of this case, the government has undermined that interest by recognizing— Is it perhaps, or is it yes, or is it no? Well, Your Honor, we haven't taken a position on that question, because the question in this case is whether the city of Philadelphia has a compelling interest, and the city of Philadelphia does not, because they have undermined that interest by recognizing a series of exceptions. And having recognized all those exceptions, it no longer has a compelling interest in insisting that the one situation where it cannot abide by any discrimination is sexual orientation, even though it tolerates racial discrimination, it tolerates— Excuse me, Mr. Mupad. You said that the city of Philadelphia could not do the same thing with respect to race, and the same supposed exceptions are there, too, ready to undermine it. But you said that that would come out differently, and I'm seeking to find out a reason why. So, the reason why is because racial discrimination is particularly unique and compelling, as this court has held— That's, like, super compelling. Is that the idea? That's right. As this court said in Peña-Rodriguez, where it recognized an exception to the jury impeachment rule for racial discrimination, particularly in older— I mean, the case is pretty generous in our society in all kinds of ways, but a compelling state interest usually allows the state to act. It doesn't usually. It does. Right. And the question is whether the government has undermined that interest by recognizing exceptions, and what I'm submitting is that the exceptions that the government has recognized here don't undermine its compelling interest with respect to race discrimination, because most of the exceptions don't even involve race, and the only ones that do involve race involve an individualized consideration of race. Thank you. So, that's— Justice Gorsuch? Counsel, can we circle back to the question whether Catholic social services should be treated as an employee or agent, and whether the city can effectively take over a service that had been provided privately for some time and take it over so much so that it regulates it pervasively, and this analysis shouldn't apply at all? Can you address that concern? In this case, while it's true that the government in some context gets greater latitude when it's acting in its attracting capacity, what it doesn't get is the ability to discriminate against its contractors on the basis of their religion or religious exercise. So, to take Justice Kagan's hypothetical from earlier, if you have a prison with prison guards to bring in peyote, it can't then turn around and say it won't allow prison guards to bring in ayahuasca. And the argument here is similar, that the city of Philadelphia is allowing all sorts of other exemptions for secular reasons. Put aside the exemptions argument. Would it otherwise be identical to a city employee or agent in the government's view? Well, no, because of the other aspect of this case that we addressed in our briefs, masterpiece, cake shop type arguments about the stuff, the statements that were made by Commissioner Figueroa and by the city council, those two... I'm asking you to put that kind of stuff aside. Otherwise, would it be similarly situated to an employee or agent in your view? So, if you take all that, if you take both the exemptions and the statements out of the case, your honor, the government hasn't taken a position about how a case like that should be addressed. Our submission is focused on both the exemption and the statement. All right, well, let's deal with the exemptions. What do we do with the Fair Practices Ordinance and the argument by the city when we normally take their representations about their law with some respect? The Fair Practices Ordinance applies by its own force and that there are no exemptions here. So, it's collided by their clear confession. So, let me make two points. The first is the language of the SPO bans any differentiation or preference in the treatment of a person on the basis of any of the protected traits. And the city concedes that it considers race and disability when placing children. That's a JA 309, Commissioner Figueroa conceded it. Thank you. I appreciate it. My time's expired. Thank you. Justice Kavanaugh? Good morning, Mr. Mupan. What if Catholic Social Services were the only private agency in Philadelphia that performed this service, meaning that same-sex couples in Philadelphia simply could not become foster parents? And let's also assume there are no exemptions or other statements that are relevant to the analysis. In that circumstance, would there be any different analysis or result in a case like this? Yeah, I think that it would be a significantly harder case, because the city at that point would have an interest that isn't presented here, namely the interest in ensuring that gay couples in Philadelphia would have the opportunity to serve as foster parents. But, of course, that isn't the fact that we have here. The facts we have in this case are that there are dozens of foster agencies that are available to serve gay couples in the city of Philadelphia, and there's no evidence that any gay couple has ever even tried to use CSS as its agency. So, on the one hand, what Philadelphia is doing here doesn't even help gay couples, and what it is doing instead is harming the very children it's trying to serve. Thank you. Justice Barrett? Good morning. So, I'm wondering how we decide whether a law is generally applicable in the relevant respect. So, you said that the city recognizes a slew of exceptions, but none of them are for the same-sex anti-discrimination requirements. So, it's not quite the same thing as granting an exemption, say, for Sunday Sabbath observance, but not Saturday Sabbath observance. That's a more apples-to-apples comparison. So, how do we go about identifying what the relevant factor is in deciding whether a law is generally applicable? So, Your Honor, in this case, the city claims to be enforcing its Fair Practice Ordinance, which limits differentiation or preference in the treatment of a person on the basis of a string of protected traits, and they recognize exemptions for a variety of those traits. Now, it's true that there is an example of them recognizing an exemption for sexual orientation, but unless they could say that, for some reason, sexual orientation discrimination is the one type of discrimination under which they can abide—no exemptions whatsoever, even more so than race, even more so than disability—it reveals that those are comparable traits, and they're recognizing exemptions in other contexts for the best interest of the child. But here, when the children would be better served by recognizing an exemption for CSS, that would allow CSS to continue to provide this work, the city refuses to do so. That is the sort of lack of religious tolerance and the lack of neutrality that cases like with Plume and Fraternal Order of Beliefs in the Third Circuit are focused on. Well, what if the ordinance said expressly that there shall be no exemptions permitted with respect to the same-sex marriage anti-discrimination requirement, period, and then had another section which permitted some exceptions, as the city employs here, like in considering  Would that be generally applicable then? The same-sex marriage discrimination requirement, I mean. I think you present a harder question. I think we would still say that, in that case, in the absence of any argument for why sexual orientation is the one form of discrimination that can't abide any exceptions, even more so than race, that the city was essentially making a value judgment in the same way that the city allowed killing for certain reasons but not other reasons. You can always imagine parsing out the statute in a different way and sort of gerrymandering the statute so that the provision that's being applied to the religious entity has no exemptions and that it's other sub-provisions that have all the exemptions. Ultimately, though, the question is whether the government is devaluing religious interests vis-a-vis secular interests, and we think that's what's happening here, because the children are not doing that. So, Mr. Bupan, would you like to wrap up for a minute? Thank you. I think here, Your Honor, at the end of the day, what the city has done is worse than cutting off its nose despite its faith. What it is doing is cutting off homes from the most vulnerable children in the city, despite the Catholic Church. The government itself requires, tolerates, and itself engages in various forms of discrimination on the basis of protected traits for the best interest of children, but then it turns around and refuses to abide by any form of discrimination with respect to sexual orientation in order to deny an accommodation to the Catholic Church. And the statements that have been made by various officials make clear that the reason they're doing that is they view this as some sort of odious anachronism, rather than, as this court has recognized, a decent and honorable view that people can recognize and accept in a country that's committed to religious tolerance. Thank you, counsel. Mr. Coffdiel? Thank you, Mr. Chief Justice, and may it please the court. This case is not about private activity or beliefs. When an FCA signs a taxpayer-funded contract, it is delegated government power to inspect and approve foster families under Section 3700 of the Pennsylvania Code. A universal clause in every contract bars sexual orientation discrimination when carrying out that delegated power. That clause contains no exceptions, and it applies equally to every FCA, religious and secular alike. CFS, as a constitution, compels the city to give it a different contract. There is no precedent for such a thing. This is, as the Chief Justice said, the city's own program and its own words of the state. The government has broad powers to impose conditions on contractors like CFS that stand in the government's shoes, performing government functions. Ms. Windham even admitted that the government has more leeway as a contractor. She just says CFS isn't one. That's all the debate narrows down to, and the contract is clear that they are. Ruling otherwise would insert federal courts into contracting decisions in all 50 states and imperil government services in many spheres. It means FCAs could discriminate against LGBT kids or categorically against foster parents on gender or religion. Justice Sotomayor asked that question apart from race, and I didn't quite hear a response from the other side. And this is not a hypothetical. The district court's hearing revealed CFS to require a clergy letter showing foster parents were active members of a congregation. Other FCAs discriminate by religion, such as against Catholics and Jews in South Carolina. Petitioners' rule would compel governments to permit all these practices, balkanizing foster care agencies and ending their openness to all. And finally, CFS says it was targeted for its police, but the district court found after three days of live testimony that never happened. The Third Circuit agreed, and nothing my friends have said comes close to the very obvious and exceptional showing of error that the two-court rule requires to reverse that. MR. GOLDSMITH. Counsel, if a foster child requested not to be placed with a same-sex couple, would you take that into consideration in placing the child? MR. GOLDSMITH. That's at a very different stage. That's at a matching stage. And we certainly, I think, have come across the idea of foster parents, and we've said they can't request a particular race. I'm not sure if we've had the question of the child itself, but I do want to say that's a very different thing. As Justice Alito was saying, that child matching stage, at that stage you're looking to the best interest. This case is about the pool stage and who is eligible at all to be a foster parent, and the record is clear. MR. GOLDSMITH. Well, I suppose there's certainly different context, but the question is, at least in this program, on the basis of sexual orientation. But you have a very strict rule. You said there'd be no exceptions to CSS's similar taking into account of the sexual orientation status of the would-be foster parents. MR. GOLDSMITH. No, Mr. Ishii, Justice. It's the same rule at both stages. So at the pool stage, there's a categorical bargain for any discrimination. It's always up to the parent's choice to work with an FCA. Now at the child matching stage, that looks to the best interest of the child, like the federal standard and that in all 50 states. That doesn't categorically exclude anyone. It looks to all potentially relevant considerations. What my friend on the other side is doing is taking one thing, which is the very, very narrow limited use of race that's taken into account as part of the best interest of the child, which is mandated by state law. And I asked the city, when have you ever taken race into account? They could only find one instance, and that was when a kid used racial slurs. So they avoided that placement of the kid with someone of that race. That's a very different thing. MR. GOLDSMITH. Justice Thomas? MR. THOMPSON. Thank you, Mr. Chief Justice. Mr. Catialdi, you placed, obviously, in your briefs and your argument today, a lot of reliance on the fact that, on your point that CSS is a contractor. Would your analysis of this case differ if, rather than receiving funds from the city or contracting with the city, CSS was a private organization that was regulated, solely regulated, as opposed to a contractual relationship? MR. CATIALDI. Absolutely, Justice Thomas. That would be a very different case, that because this is the contracting circumstance, the government has far more leeway in what is actually similar when you heard all of those things about race and disability and the like. Umbauer says courts must give deference to the government's reasonable assessment of its interest as contractor. And so when you're looking to what is similar and what is different, I think it's very similar in the Lukumi sense. The government is saying that those distinctions made on the best interest of the child are made at a point when their interests are very different. It's about matching kids, not growing the pool of, say, foster parents. And it's not discrimination. The government is saying, at that point, it's done to protect the welfare of an individual child. And there's nothing like the across-the-board, flat refusal that they want to hear. Look, if a Catholic teen wanted to be with a Catholic family at the child matching stage, that could be taken into account. Lots of things can be taken into account at that stage. But here we're talking about that first stage, as Justice Alito said. I'd like to get one question in before my time expires. Don't you think it's in the best interest of the child to also have a pool that is beneficial to the child? I don't understand why that isn't also in the best interest of the child. Oh, absolutely, Your Honor. We 100% agree. The city's point is that when you enable the NFCA to discriminate on the basis of orientation, that will stigmatize the youth. That is a compelling interest. LGBT kids are an outsized number of people in the foster care population. And it'll undermine the ability of the program to operate. Absolutely, Justice Thomas. We 100% agree that the best interest of the child looks to what is the best place for that particular child. Thank you. Justice Breyer? Yes, what's actually bothering me quite a lot about this case is I think that no family has ever been turned down by this agency. Indeed, none has ever applied. No gay family. No gay couple. And the disagreement seems to be whether they now have to sign a piece of paper that said, if there were a gay couple, we might have to look into whether they're qualified. And you're willing to have them say, but taking gay into account, you don't have to take it into account at all. They don't want to do that. Now, that seems to me a very narrow ground for deciding a case that has enormous implication. Could you not say, hey, we think if there ever were a gay couple, and it really was a problem, you'd have to do something about it, like look into it and don't say gay. And they say, we don't even want to do that, but it's never come up. I mean, the natural thing for me to say, okay, you say what you want, we'll say what we want. And if it ever comes up, we'll deal with it. But it never has. Is there any way that that has anything to do with how we would decide this case? Justice Breyer, this has actually come up. Bethany, the other SCA, turned a couple away. That's what led to the newspaper article and this entire set of events. And in response, I think the city acted reasonably. It had been aware of CSS's religious beliefs for decades. That's Joint Dependents, page 165. But it never stopped the contract because it thought that CSS was operating within the contract terms. They took CSS at its word until they learned otherwise. And it was at that point that the city said, we're worried about making the city itself a party to discrimination. And even then, they didn't declare a breach. Rather, they just said, the next annual contract we won't renew because they're telling us after our investigation, they won't fulfill the terms of the contract. But notably, of the $17 and $19 million they gave CSS for foster care, they took two away for this parent pool function, but they left the rest intact. And to this day, CSS is getting $26 million a year from the city, which is hardly something demonstrating religious hostility. And that is for foster care and child services. So I think the city took that reasonable, limited action. And they certainly don't need to wait for an instance of discrimination with respect to this particular entity. I mean, in NASA versus Nelson, there was no evidence of drug abuse. But the government still insisted on tests. And this court was unanimous in saying that was OK. Justice Alito? In your brief in opposition, when you were trying to persuade us not to take this case, you represented that the city had adopted an exemption waiver committee, quote, to ensure that in the future, any requests for a religious exemption of the sort at issue here would be directed to the waiver exemption committee and handled through the procedures that it establishes. Page 15. Was that accurate? That is accurate, Your Honor, that we said at page 15 that the city had established after the events that gave rise to this case in its law department something to, quote, address waiver and exemption requests. That's a general committee. That's not even about foster care agency. It's not even about religion. It's a general committee for everything. Well, the plain meaning of that statement is that if CSS or another religious organization came to the city and said that we do not, it is contrary to our religious beliefs to certify a same-sex couple, there would be consideration of an exemption. Your Honor, the city's policy, the city's view on this has been clear from the start. They can't make exceptions on the basis of the Fair Parent Practices Ordinance at all when it comes to things like this at the child's, excuse me, at the parent pool stage. There are some exceptions that can be done under 3.21 at the matching stage when the child is matched with an agency, but that's really just about DHS making an individual referral to a particular agency at that limited, particularized stage. If that's the city's policy, then the statement that I just read seems to me to be quite misleading, but I'll move on from that. Look, if we are honest about what's really going on here, it's not about ensuring that same-sex couples in Philadelphia have the opportunity to be foster parents. It's the fact that the city can't stand the message that Catholic Social Services and the Archdiocese are sending by continuing to adhere to the old-fashioned view about marriage. Isn't that the case? Absolutely not, Justice Alito. The text, of course, of all of this doesn't say anything like that. As the District Court and Third Circuit found evidence by evidence, piece by piece, they rejected that idea. I think, Justice Alito, the most telling fact about that is right now the city is giving that very entity, which you're saying that we can't stand and the like, $26 million a year for foster care. I think the annual Supreme Court budget, that's the one-third of the annual Supreme Court's budget, we're doing that every single year for this entity. Well, as far as the record reflects, no, what Catholic Social Services has done has not denied any same-sex couple the opportunity to be foster parents. Because they would refer such a couple, if one were to come to them, to one of the many agencies that is willing to do what is necessary for them, there's no realistic chance that that is ever going to happen. But the city, nevertheless, is willing to cut them off from participation in this program, even if what that means is that there will be children in Philadelphia who will be denied the opportunity to have foster parents. That's what the record shows. Justice Alito, three things. One, we are very happy to talk about the record because we don't think it supports that at all. Indeed, it supports that CSS told us that if this happens, this is precisely what they would do. It did happen with respect to Bethany. Second, that was the exact colloquy you and I had many years ago on NASA versus Nelson, when the petitioner said, hey, there's no evidence of drug abuse, you got to wait for it. And your unanimous opinion for the court said, no, the government doesn't need to wait in order to act. And that's particularly so, and this is my third point here, because here the government has identified the most compelling of interest in protecting its own wards of the state. It needs to maximize the number of parents in the pool and avoid stigma to parents and to youth. Justice Sotomayor? Counsel, is there any evidence that since CSS has not been a part of this program, that less children have been placed overall? Absolutely not, Justice Sotomayor. In fact, there's a district court of the record found the opposite, and that's also true in other jurisdictions that have adopted non-discrimination policies, such as D.C. and Illinois. That's all in the 22 states brief, and the ABA has studied this particular issue and found that these non-discrimination policies increase the number of people available, not decrease, because these policies of discrimination deter people from entering the pool in the first place. Have Catholic family numbers reduced since CSS hasn't been a part of this program? I don't think we have numbers on Catholic specifically, but we do have numbers, for example, in Massachusetts that when Boston Catholic Charities withdrew, other agencies filled the gap so that there were at least more kids in foster care then than now. We certainly welcome the idea of CSS and other Catholic entities protecting and working with the foster kids. That's why we're giving them $26 million here to do so. We tremendously value what they're doing. We weren't looking for some sort of fight here. Obviously the city was torn up about it, but they looked at the stigma, they looked at the need to increase the pool, and they looked at and thought about the fact that you couldn't have SCAs just grafting on new requirements to a contract that they themselves signed. Going to that issue in terms of tolerance, because that seems to be part of the questioning of some of my colleagues, and you're addressing it by saying there's tolerance in their work in other areas. They're receiving a tremendous amount of money for their work with foster children in other ways. But looking at this under Smith, that pool, when you say there's two different pools, one is the pool of can you become an eligible family, and then there's a pool of placing a child. How do you see Smith addressing that? I think what Smith does is, at least in the contracting context, give the government wide latitude. You wouldn't even need it, because I think we would win even in the sovereign context. But I think the fact, what you'd be asking is, is this really a similar circumstance at the pool stage or at the child matching stage? And they're really different interests, that's what the government is saying, and different harms. And across the board, flat refusal of a government agency to say, hey, the doors are closed to you entirely, is very different from the sort of individualized best interest of the child determination that they are focusing on. And they focus on disability as well. That absolutely misstates the record, because it's state law that requires foster care agencies to have a special license for disability needs. That's all that's about. Again, that's not discrimination. That's specialization to meet a child's needs. Has any parent been, other than disability, but that's because they can't meet certain criteria that's independent of their disability. They can't do certain things for the child, which are required. But has there ever been an agency that has, or an exemption granted on the basis of a protected characteristic? No, Your Honor. The one thing that I said, and we don't think of it as an exception, we think of it as an application of the best interest of the child, was when a particular child used racial slurs, and so they avoided placement of the child with someone of that race, just for the safety of that individual child. That is so fundamentally different. Mr. Caccio, I'm concerned about Section 3.21 of the contract. So, the 2019 version of the contract says, and I'm quoting here, that an agency shall not reject prospective foster or adoptive parents for services based on sexual orientation unless an exception is granted by the commissioner in his or her sole discretion. So, why isn't that exactly the kind of exemption that CSS wants here? And why doesn't its presence undermine the state's reported interest? Your Honor, I think the district court looked into this and found that DHS has never made an exception to its non-discrimination requirements, including under 3.21. We don't think that's true, Mr. Caccio. I mean, that no exemption has ever been granted under that provision. I mean, I read Smith and Lacuni to say that you can't get out of it so easily, that as long as there is an exemption, as long as it exists, as long as you could rely on it in the future, that there is not neutrality here. Well, I disagree both at the law and then with respect to the facts. So, with respect to the law, Your Honor, Smith doesn't say that the mere existence of the system triggers strict scrutiny. It says you can't give exemptions discriminatorily. So, if the city was exempting secular organizations from non-discrimination rules, but not religious ones, that would be what would trigger strict scrutiny. And we know this because Smith said an across-the-board criminal prohibition is a paradigmatic of something that is generally applicable, but that's also obviously the paradigmatic example of something with exemptions and broad discretion, as this court's opinions and Armstrong and McCleskey recognized. And with respect to 3.21, Your Honor, it does two basic things. First, it says that it bars FCAs from rejecting a referral from DHS. And a referral can only be from DHS. And indeed, their blue brief at page 13 admits that. And then the second thing it does is it says DHS can make an exception to that. It says, quote, provider shall not reject a child unless an exception is granted by the commissioner. So, that's about like if the child was far away or something like that, we're not going to force the FCA to take it. But there's nothing about any sort of categorical or classification on race or gender or anything like that with respect to 3.21. And it certainly hasn't happened in practice, which is actually, I think, the standard of Smith. Thank you, Mr. Goddard. Justice Gorsuch? Good morning, counsel. I'd like to follow up with more or less where we left off. There seems to be some lack of clarity about which stage we're at here, whether we're at the matching stage or at the screening stage. As I understand it, this case is about the screening stage, whether Catholic services would be eligible to participate in the program at all. Is that correct? Well, when I say screening, I mean parent screening. Basically, CSS has said they will not permit LGBT couples to be part of their screening process. So, if you're a married gay couple, you can't. The doors are closed to you, but not to a heterosexual couple. And that's the stage of the process we're currently dealing with. Is that right? Correct. Exactly. All right. And at the screening stage, my understanding is, from your latest brief, at least, that the Fair Practices Ordinance forbids any exemptions at all. Is that right? Correct. And that's always been our policy. Okay. And then just to follow up on Section 3.21 at the matching stage, why is that legally irrelevant here? Well, because it's at a very different stage. And at least in the government contracting case, it's not similar in the Lukumi sense. Because the city is saying, and I think it gets a lot of deference under Urenbauer, our city interests are different. We're about trying to grow the number of maximum safe foster parents. And policies like this deter and block LGBT parents from coming in and send signals to LGBT youth. At the matching stage, of course, first of all, you're complying with state law. So it's a very different thing, the best interest of the child. But second, that's a much more particularized inquiry. And again, it applies even-handedly. It just may be that it's in the really rarest of instances, like the one example I was able to give you, you might take a protective classification into account. Thank you. Justice Kavanaugh? Good morning, Mr. Katyal. I have a bigger picture of thought to express, and you can react as you wish. It seems like this case requires us to think about the balance between two very important rights recognized by this court. The religious exercise and belief right, obviously, in the First Amendment. And the same-sex marriage right, as recognized in Obergefell. And it seems when those rights come into conflict, all levels of government should be careful and should often, where possible and appropriate, look for ways to accommodate both interests in reasonable ways. You know, it's very sensitive, controversial. There are strong, very strong feelings on all sides that warrant respect. And it seems like we and governments should be looking, where possible, for win-win answers, recognizing that neither side is going to win completely on these issues, given the First Amendment on the one hand and given Obergefell on the other. But when I look at this case, that's not at all what happened here. It seems like Philadelphia created a clash, it seems, and was looking for a fight. And it's brought that serious, controversial fight all the way to the Supreme Court, even though no same-sex couple had gone to CSS, even though 30 agencies are available for same-sex couples, and even though CSS would refer any same-sex couple to one of those other agencies. And to be clear, I fully appreciate the stigmatic harm. I completely understand that. Fully appreciate it. But we need to find a balance that also respects religious beliefs. That was the promise explicitly written by the court in Obergefell in a masterpiece, explicitly promised that respect for religious beliefs. And what I fear here is that the absolutist and extreme position that you're articulating would require us to go back on the promise of respect for religious believers. So Justice Kavanaugh, four things. First, we absolutely agree with you that these are feelings that warrant respect, and both of these rights are important, and we share that same spirit. Second, I don't think the framing of this as religion versus same-sex equality is the right one. The way the city sees this is actually a case about religion versus religion, because if you accept what their argument is, then they will allow, you know, another FCA can say, we won't allow Baptists, we won't allow Buddhists, or we'll only allow those things. And in that sense, religion will be pitted against religion. Foster care agencies will be balkanized. And this will be true not just in foster care, but in any number of other areas in which the government contracts. Third, practically, I don't think you can look at this and just say, oh, this is a small, tiny accommodation. What's the harm in it? Because any individual accommodation will look reasonable. The problem is, as Chief Justice Berger's unanimous opinion in the United States versus Lee says, once you do it for one objector, the court's going to be stuck doing it for all. I mean, the accommodation there was a pittance. It was someone objecting to paying Social Security. But the court said income tax would be next, and you can't have a workable system, either for Social Security payments or now for FCAs, with so many religious accommodations. And then lastly, when you say the city was looking for a fight or something, we couldn't profoundly disagree more. We certainly wouldn't rush this case to the Supreme Court. Indeed, we won it in both courts below. And the first one, after a three-day hearing, looking at live testimony, looking at precisely the allegations you said about religious hostility, and all of those dissolved. Thank you, Mr. Chief Justice. Good morning, Mr. Katyal. I just want to be sure that I'm clear in thinking about this question of whether the city was functioning as a contractor or whether it was granting licenses. Is it possible for any entity to participate in the recruitment and certification of foster families without a contract from the city? Not with respect to this function. And so I think that's a very important point about what Ms. Linden said. She kept on saying, we've been doing this for two centuries, this. Private entities have never done this. Because whatever these entities did before, like CSS, they never selected who cares for kids in city custody applying state criteria. Indeed, the whole point of the modern foster care system is to bring responsibility for the private hands. I mean, these are wards of the state, and the city has the highest interest in screening parents. So this isn't an example at all of something that could be described as a licensee function, because a licensee is someone, you know, when someone's licensed, like to practice law or run a barbershop, they're not carrying out the government's work, they're performing their own work, a private profession with the permission of the government. This is the opposite of that, Justice Barrett. This is about the city's own kids, and the city's interests here are at their zenith. Let's imagine that the state takes over all hospitals and says, from now on, you know, we are going to be responsible for hospitals, but we will contract with private entities to actually run them. And so there's a Catholic hospital and gets a contract with the city to run it. In fact, it's a Catholic hospital that's in existence before the state adopts this policy. And its contract with the state provides that there are, and the contract the state gives everyone, is that you can get some exceptions for some medical procedures, but every hospital has to perform abortions. In that context, do we analyze this as a licensing question? Or given that the Catholic hospital can't even enter the business without this contract, do you still say that this was the provision of a contractual service? So three things, Your Honor. First, this isn't, just factually, this is not a monopolization case at all. Contrary to what my friend says, after all, they still have $26 million to lion's share of their foster care budget. So it's not as if we're occupying the field or something like that. With respect to your hypothetical, I think there are two problems. One is, I think the real thing that does the force in the hypothetical is the government somehow monopolizing a private care system, a healthcare system or hospital system. That itself would raise any number of constitutional problems. And I think our intuitions to why that hypothetical sounds so horrible is because of that. That's what does the work. I'm going to wrap up. Mr. Cocktail? I'd say three things are notable. First, this case, I think as Justice Scalia might say, comes as a wolf. Petitioner's rule would enable an FCA to exclude parents of any religion from Buddhist to Baptist. And this court, because it can't second guess the reasonableness of a belief, it opens the claims, indeed this very case, the clergy letter, and it radiates far beyond foster care to all government contracts in all 50 states. Second, the city would act the very same way if a secular FCA discriminated. And the flip side is true, too. The city contracts with Bethany, which is open to same-sex couples despite its religious opposition. And the city continues to contract with CSS to the tune of $26 million. These three indicia, a uniform policy, continued contracting with Bethany, and continued contracting with CSS itself, are strong evidence the two courts below got it right. And finally, my friends, never overcome the two-court rule on neutrality. After three days of live testimony, the trial court found the preponderance of evidence favored the city. For these reasons, we ask the unanimous judgment of the Third Circuit be affirmed. Thank you, counsel. Mr. Fisher? Mr. Chief Justice, and may it please the court, I think what makes this feel like a hard case is that CSS is doing valuable work. It is acting based on traditional religious beliefs. And it may appear that the cost of accommodating it would not be too high. But that overlooks two serious problems with CSS's claim. First, CSS is not acting in its private capacity, but rather as a government contractor. Its claim, therefore, implicates the government's managerial interests as well as the imperative that governmental services are made even-handedly available to all citizens. And second, free exercise claims cannot turn on judicial assessments of whether religious views are honorable or offensive. If the Constitution requires accommodation here, then Mr. Katyal said that all manner of other allowances must be made for foster care and other service agencies. And because there's no constitutional difference between independent contractors and government employees, CSS's position would also imply, for example, that police officers could decline on religious grounds to enforce particular laws. Prison guards could insist on evangelizing to inmates. The implications go on and on, but the upshot is this. Whatever rules might govern free exercise claims outside of government contracting, the city's anti-discrimination requirement is constitutional because it is a reasonable rule governing the selection of those who will care for children in the city's custody. Mr. Fischer, suppose that the city of Philadelphia decides that it doesn't like the message that the church having an all-male priesthood, the message that that conveys, it doesn't want to expose foster children to that belief in foster parents, and so it terminates CSS's contract because of the church's belief in that respect. Are they free to do that? I think there would be two big differences between that and this case, Mr. Chief Justice. Number one, as the court recognized in Hosanna-Tabor and the like, clergy members of the church and the way that they are structured within the church raise establishment clause questions and free exercise questions that are entirely different from a government contracting scenario like this on their own terms. And second of all, I don't understand any way that that rule would relate to the carrying out of foster care services. The core problem, the core question here is whether the government is imposing a reasonable condition on the carrying out of the services. The way it would relate is the same way that the same-sex ban, because of the church's view on it, CSS's, is that they think it's stigmatizing, that it sends the wrong message for foster parents to belong to an entity that discriminates on the basis of gender. No, I think that the stigma and the harm that the city is looking to avoid is the discrimination with respect to people participating in the program. That's very different than the church's own structuring of its own internal clergy and its own internal operations. Thank you, Counselor. Justice Thomas? Thank you, Mr. Chief Justice. Mr. Fisher, I want to go back to the assessment of the pool as Mr. Katyal designated it and the placement. Do you agree with him that both of these have to be looked at in the best interest of the child? Well, I think just to be precise, Justice Thomas, the state law best interest of the child test applies only at the placement stage. That's unique to the placement stage. I think what Mr. Katyal was saying is that, of course, the city and the state are going to establish rules for family certification at the outset in the general interest of children, but specifically speaking, the best interest of the child test comes into matching. Justice, under federal law and under other state laws, applies only— So, on what—excuse me. I'm sorry to interrupt you. It's just we're short on time. So, what would be the standard? Why the assessment of the family? Then, if you say statutorily it's only the placement that's in the best interest of the child, what's the policy behind assessing the family? I think the idea behind assessing the family goes to the core of the reason why this is a city program, is that these are children in city custody, and so the city is establishing criteria that are going to govern which people are allowed to undertake that. No, I mean, generally, what are you looking for? You're looking for people that can provide care and loving environments and safe environments to kids. And why are you looking for that kind of a family? Pardon me? Isn't that ultimately just for the best interest of the child? I think that's one way to think about it, Justice Thomas, which is why I think Mr. Cashaw answered your question that way. I'm just trying to be precise about the way the law works here, which is that the standards for certification are laid out in Pennsylvania Code Section 3700.64, and the best interest of the child standard is not present there. It's simply a list of secular criteria that the agencies are being asked to apply. Thank you. Justice Breyer? In general, what have you thought should be the right rule? I mean, I've always thought that Smith is a problem or a solution to a problem that nobody could figure out how to answer it. If your opponents win, it's pretty hard to see how all kinds of government programs can exist with every religion making exceptions every which way for every kind of reason. Sincerely, too. If you win, it's pretty hard to see how, for example, a religious group that wants to meet on Sunday, the only place to hold services, that there is a fair no parking sign and they can't do it. I mean, they can't even hold religious services. And we could think of lots of examples like abortion and so forth. And that, I think, is what led Justice Scalia to that more absolute rule. He couldn't figure out another one. So, have you anything there? That you can suggest? After all, RFRA is one way. But RFRA, they can change Congress if we make a mistake. The Constitution, you really can't. That's why I asked the question, just to see what's in your mind. Right, Justice Breyer. I think that Justice Scalia, for the reasons he laid out of Smith itself and in the city of Bernie concurrence, reached a quite reasonable conclusion that is right on its own terms and entitled to stare decisis effect. But the most important thing I would tell you here is that you don't even have to ask that question. The court recognized before Smith itself, in cases like Lange and Roy, that when we're dealing with internal affairs of the government and its own operations, the different test applies. And the test that I would say governs this case, which is really quite narrow in this sense, because it's a government contracting case, is the test the court laid out in NASA versus Nelson, where the court asked whether it was a reasonable rule that the government was insisting for its contractors. Actually, the court, in that case, used the phrase internal operations. So all you have to do is put Nelson together with Lange and Roy, which tell you that the pre-exercise clause allows the government the same power when it deals with its internal operations. Justice Alito, do you think it's fair to say this is simply a government contracting case when Catholic social services and other agencies cannot participate in this activity at all? An activity in which some of them at least have been participating long before it was taken over by the state, unless they are approved by the city. Even if it's partially a contracting case, is it not also partially a licensing case? For two reasons we don't think it is, Justice Alito. First, even if the city did monopolize the services here, it wouldn't be any different than Lange, where the government owned the land. It wouldn't be any different from NASA versus Nelson, where the government was the only way to work in the space program. And the government, as Justice Kagan said earlier, can take over certain operations. Indeed, the city, as Justice Sotomayor said, could do the certification itself. But also, I want to answer Justice Alito in terms of the history, and I want to echo what my friend Mr. Katyal said, which is that yes, the same term foster care is used that was used in the city, but it's a completely different program now, because the children are in city custody, and we're talking about select... Well, the government has expanded at all levels, and it has taken over more and more programs that were previously conducted by private entities. What if the government took over all provision of assistance to homeless people? Would that issue arose about whether a private entity could participate in that charitable activity? Would you say that's purely a contracting case? I think I might have to hear a little more, but in general, I do think the government could take over something like homeless shelters in a given county or community. I don't think there's any way to draw a line between what the government can and can't take over. Well, what about Justice Barrett's example of a hospital? What if the state were to take over all hospitals and then contract that out to private entities? Well, I think that that's really hard to imagine exactly how that would work. We know healthcare is such a uniquely complicated context, and I think that even in systems where the government does take over healthcare, private options are still available, so it's hard to imagine how a hypothetical along those lines would play out. I'm just disagreeing with the hypothetical. I don't think it's hard to imagine at all. But if you accept the hypothetical, then what's the answer? What's the answer to what? I'm sorry. Would your answer be the same? If the government took over all hospitals but contracted it out to private entities, it could insist that the hospitals perform procedures that are objectionable on religious grounds to the contractors, so-called contractors running these hospitals. I think to some degree, perhaps, Justice Alito, but I think there'd be very different questions raised about medical procedures and doctors that certainly have the opportunity to decide which kind of procedures they're going to carry out. I think if this were the federal government, which I take as what your hypothetical is raising, you'd also have any number of RFRA implications that would have to be layered onto a question like that. Justice Sotomayor? Mr. Fischer, perhaps we should talk about the function, because there is an amicus brief that suggests that in normal contractor cases, the Rutger brief, that in normal contractor cases, you apply rational basis. But where the government has taken over a field, it should be strict scrutiny. And this goes back to Justice Barrett's earlier question about how to define the field. There are still private placement with foster parents that CSS can still engage in. The only children in the state's custody are those that have been essentially abandoned or taken away from their parents, correct? I think, in general terms, it's correct, Justice Sotomayor, that there is, on the one hand, foster care certification services for children in the city's custody, which is something that you can do only through a contract with the city under the terms we're discussing here. There are other things that, as Mr. Katyal noted, with the foster care program that CSS is allowed to do. And there are other private things that CSS can do without even contracting with the city related to adoption and other ways to care for needy children. So there is no occupying a field here, other than these happen to be the kids who, either because of abandonment or abuse, have been taken away from their parents that are in the city's custody, correct? I think that's right. But the thing I would want to make sure I stress, Justice Sotomayor, is that even if the other side were right, that the city, however you would want to look at this, has occupied the field of parental certifications, it would make it no different than Lane. It would make it no different than Nelson. It would make it no different than Garcetti, where the government occupies the field of prosecutions. The government occupies the field of law enforcement. There are lots of places where the government has reasonably made the determination to carry out a certain service and is allowed to establish, as Nelson put it, reasonable rules to carry out that service. I have one last question. If one wanted to find a compromise in this case, can you suggest one that wouldn't do real damage to all the various lines of law that have been implicated here? Well, I think Justice Sotomayor, the place to start in that respect, would be where Justice Fisher said earlier today, with the city's concession at pages 45 and 46 of its brief, that if what CFS is concerned about is the perception that by participating in this program they are endorsing marriage for same-sex couples, that they can disclaim that and make very clear that all they're doing is following state law and to carry out a government function on the government's behalf, and they are not purporting to speak for themselves in any certification. Justice Kagan? Mr. Fisher, the Solicitor General's main argument here is that the city has undermined its asserted interest in non-discrimination by having a series of other exemptions to the one that—other exemptions that are similar to what CSS wants. And I talked with Mr. Cottingall about 3.21. The Solicitor General also references various policies that have to do with place in children and consideration of race and disability at that stage. So I was wondering if you could explain to me why those are permissible, but the city should not be able to give an exemption to CSS. Of course, Justice Kagan. Let me say one thing about the law and then give you a broad stroke answer and any specifics I'm happy to answer. First, the Solicitor General, I think, somewhat strangely tried to put entirely aside the contracting context of this case in asking these questions about general applicability. As the court said in Umber, the court has to give reasonable deference to government's assessment of its own interest in the contracting space. So even in this general applicability context, Justice Kagan, I want to stress that the government contacting—I'm sorry, the government contracting context is highly relevant to this comparability inquiry that is required. And I don't think the Solicitor General even denied that. And I'll just say in broad strokes, the purported exemptions that the other side points to when it comes to the certification process simply do not exist. The closest they've come is to talk about disability being taken into account. But it's not disability that's taken into account. It's just the criteria that I discussed with Justice Thomas that are neutral and secular as to the ability to care for a child to which disability is sometimes relevant. That leaves child placements. And in child placements, it's just a different set of rules that apply because that's a different stage of the process. And so the key answer there is that the city has reasonably concluded that that's just not a comparable setting because the best interest of the child in matching somebody on an individualized basis kicks in. And that's not the scenario at the certification stage where all we're asking is whether somebody can care for children. And back to the question about a compromise, CSS has not disputed that same-sex couples are equally able to care for children. And so we think the placement scenario is just entirely different. Thank you, Mr. Fisher. Justice Gorsuch? I'd like you to expand on that just a little bit further, Mr. Fisher. One of the challenges of Smith, of course, is asking whether there's an exception. And that raises all sorts of questions about at what level of generality should we look and what's comparable enough. Why isn't the 3.21 matching process and that contract process sufficiently like the screening process that we should consider it? Justice Gorsuch, I think for two reasons I'd stress. One is, as I understand Section 3.21, it applies to referrals from DHS. That is not the certification process. That is the matching process or similar situations. And so the answers I just gave to Justice Gage— I'm sorry to interrupt, but I accept the legal point that there are different stages of the process, formally speaking, legally. But why shouldn't we take cognizance of it when we're doing the Smith analysis? Okay, well, let me answer it this way then. Smith did not say the mere availability in the air of individualized treatment is enough to make it not a generally applicable law, because as Mr. Katyal said, then the criminal law itself would not be a neutral, generally applicable law. You have to have some disparate treatment of religious reasons versus secular reasons. That's what Justice Alito said in the Fraternal Order of Police opinion that the Solicitor General relies on. It's not okay to let people wear beards for medical reasons but not for religious reasons. And so, as a Volca brief also describes, it's not just whether in the air there's a possibility for exceptions or differential treatment. It's whether you've actually had such treatment, because otherwise you just simply don't have a workable system of law. Thank you. Justice Kavanaugh. Good morning, Mr. Fisher, and welcome. Thank you for your—and I want to thank all the parties for their excellent briefs and the amicus briefs, which have all been very valuable in thinking through these issues. Just a couple questions to just confirm a couple things factually here. You agree, I assume, that Catholic Social Services does important, valuable work for vulnerable foster children in Philadelphia? Of course, yes. And then, do you agree that a same-sex couple in Philadelphia can become foster parents by going to one of the 30 agencies? Indeed, do you agree that no same-sex couple has ever gone to CSS, and if they did, that they would be referred to one of those 30 agencies? Do you disagree with any of that? Justice Kavanaugh, no, I don't as a factual matter, but remember that the same-sex couple was turned away from Bethany, and the caution I would give you to rely too heavily on this 30-agency idea is that, remember, we don't know how many agencies will discriminate against people based on sexual orientation, religion, or other characteristics if the city is required to grant exemptions. And I don't think the court wants to go down a road of having to count up how many agencies at the end of the day are discriminating on what basis. As you yourself asked, what if there were just one agency? What if there were two or three or five? I think that's a really difficult area for the court to have to get into. Well, I agree with that, but arguably the response to that might be we shouldn't be looking for problems before we confront them. Fair enough, Justice Kavanaugh, but remember, you don't even get to this set of questions because this is a government contracting case. And as the court said in Nelson, you just ask whether the government's position here is reasonable, and the government has two eminently reasonable interests it's seeking to vindicate here. One is to treat all citizens equally when people are carrying out the government's own programs and not to balkanize its services. And secondly, the government just has a managerial interest. As I was just describing, if you have to start granting exemptions, all of a sudden running a program through the government gets very, very hard, even to the point where the city might just say, the heck with it, we're going to take this in-house and do it ourselves. And I don't think anybody disputes that the city could do that. And once you've admitted the city could just do these certifications itself, it seems very odd to conclude that CFS is entitled to exist on its own rules when it's carrying them out on the city's behalf. Justice Barrett? Good morning, Mr. Fisher. I have a question about something that some of the amicus briefs brought up, which is the third-party harm principle, the principle that religious beliefs can never give a believer the right to harm a third party, even slightly. I'm wondering if you agree with that. And if so, if you could tell me where in law the principle comes from. Justice Barrett, I'm not sure that that's true as a categorical rule. I think that, as some of the questions have pointed out this morning, when you get into situations like this, you need to balance the free exercise interests on the one hand against whatever the governmental interests are on the other, at least in the abstract. So I think that, as I was just saying to Justice Kavanaugh, you don't get to a balance of the harms in this particular case, because it's a government contracting case. And all you ask under Nelson is whether the government's rule is reasonable. But even if you did get to that, and even if it were relevant, whether there were third-party harms, as I was just describing, we would say there are serious governmental harms, and there are also private harms. We've talked about people being turned away in Philadelphia, and the amicus briefs tell you they're turned away elsewhere. But remember, there's also a deterrent effect. If people are aware that the government program allows discrimination, they may never enter the pool in the first place. There's no brochure that tells people, you know, this agency is for people of your kind, and these other agencies are for people of the other kind. And frankly, if there were a brochure in that respect, it would just make it all the worse. So I think there are very real harms here, Justice Garrett. I wouldn't take the categorical view, though. I want to sneak in one other question. I think we would agree that there's really not any circumstance we can think of in which Can you think of any example in which saying, as, you know, CFS has done here, that they, you know, will not certify same-sex couples that were in objection to same-sex marriage would justify an exemption? Or is it like racial discrimination? Well, Justice Barrett, I think for purposes of your analysis here, it is like race discrimination. I understand that race is special in many ways, and the Court's jurisprudence. But as Justice Gorsuch stressed in Masterpiece Cake Shop, it is the proudest boast of free exercise jurisprudence that we do not judge the legitimacy or the offensiveness of religious beliefs if they are deeply felt, which, as we know from the Bob Jones case, for example, some religious organizations do have deeply felt views about interracial marriage. I think the Court would have to accept them. And then the only question would be whether the compelling interest test applies differently in that scenario. And I don't think it would. It's a matter of just compelling interest law. The Court has said not just that governments have an interest in eradicating race discrimination, but also in Jaycees, the Court said sex discrimination. As we know from last term in Bostock, this could be thought of as sex discrimination. And so I just don't think you could draw a line in this context between sexual— A minute to wrap up. Mr. Fisher? Thank you, Mr. Chief Justice. I think I would just leave you with the last—a couple of the last points I was making, I don't think anybody can dispute that if the city wanted to do this work itself, it could. And so the only question that you have is whether the analysis is any different because the city is operating through an independent contractor. In cases like Nelson and Ling tell you the answer is no. Also, Russ B. Sullivan, in case we haven't yet discussed today, tells you the answer is no. And so that just leaves the arguments the Solicitor General is making about neutrality and the like. And I think the irreducible fact in that respect is that the city here would not allow this discrimination for any reason. The District Court found this at page 85A to 88A. I don't think anybody really thinks that this kind of activity would have been allowed in 2018 or going forward for any provider for any reason. And for that reason, we think that this is a case—one way to think about this is a case about equal treatment versus special privileges. The city has satisfied the equal treatment requirement, and it's not required to give special privileges here. Thank you, Counsel. Three minutes for rebuttal. Ms. Windham? Thank you, Mr. Chief Justice. Three quick points. First, the discussion this morning has confirmed that Philadelphia does not have a neutral and generally applicable law. They have waivers and exemptions. They let agencies consider factors that are prohibited under the Fair Practices Ordinance, and they don't follow that ordinance themselves. Philadelphia now admits it's applying its public accommodations law, and the analysis would be different if the court analyzed the use of sovereign authority under that law. Even under Smith, that triggers strict scrutiny, and the city loses. Second, respondents ignore the long history of Catholic Social Services doing the work it does today—partnering with foster parents to provide children with a family, walking with and supporting those families through a years-long and difficult process. This is the ministry that the city of Philadelphia is trying to extinguish. The fact that CSS carries out other ministries and provides services at a loss, subsidizing the city, does not change the fact that the city is trying to extinguish this ministry. And it has done so in the most restrictive manner, sending the message that Sharon L. Fulton must be excluded because she partners with an agency who shares her faith. Respondents urge the court to decide some other case, not this case. They claim all kinds of harms, but religious foster agencies continue to serve in most states, and multiple states have even protected those agencies by law, without negative results. Longstanding protections like RFRAs protect religious exercise, and yes, even government contractors, yet respondents cannot identify where their parade of horribles has come to pass. Finally, none of this was necessary. It all could have been avoided by a properly functioning free exercise clause. The courts are struggling to parse the exact contours of general applicability, while loving foster families remain excluded. The text, history, and traditions of the free exercise clause teach that when the government wants to prohibit a longstanding religious exercise, it needs a compelling reason to do so. That's a straightforward approach, and Philadelphia can't hope to pass it here. In our pluralistic society, this court has repeatedly said that there should be room for those with different views, but Smith's narrow view of the free exercise clause stands in the way of that sensible result. Under Smith, particularly as applied by the courts below, government officials have no incentive to reach sensible accommodations, knowing they will be shielded by the flimsiest claim to have a generally applicable law. Our pluralistic society is at its best when it has a free exercise clause that protects free exercise, not just of those who agree with the officials in charge. Thank you. Thank you, counsel. The case is submitted.